IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GRAHAM STOWE,

                Petitioner,                      REPORT AND RECOMMENDATION

    v.

                                                    18-cv-400-wmc

GREGORY VAN RYBROEK,
Director, Mendota Mental Health Institute,

                Respondent.

## REPORT

Petitioner Graham Stowe is confined at the Mendota Mental Health Institute in Madison, Wisconsin. After being charged with violent crimes in 2004, Graham was found not guilty by reason of mental disease or mental defect ("NGI") and was committed to the custody of the Wisconsin Department of Health Services for a term of 39½ years.

In February 2016, Stowe petitioned the state circuit court for conditional release. Among other things, Stowe argued that the state was violating his right to due process by continuing to detain him even though he was no longer mentally ill. The Wisconsin Court of Appeals disagreed and affirmed the denial of conditional release. The court found Stowe's due process claim foreclosed by the Wisconsin Supreme Court's decision in *State v. Randall*, 192 Wis. 2d 800, 532 N.W.2d 94 (1995), which held that Wisconsin's statutory scheme for confinement of NGI acquittees was facially constitutional even though it permitted continued confinement based solely on a determination of dangerousness. Stowe filed a petition for review asking the Wisconsin Supreme Court to reconsider *Randall*, but the court declined to grant review.

Stowe now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, reasserting his claim that he is in custody in violation of the Due Process Clause of the United States Constitution.   Stowe contends that his continued confinement despite the State's concession that he no longer has a mental disease or defect that would have supported an NGI plea in the first place is inconsistent with the Supreme Court's decision in *Foucha v. Louisiana*, 504 U.S. 71 (1992).  Stowe's petition, in effect, asks this court to overturn the Wisconsin Supreme Court's 27-year-old decision in *Randall* and declare unconstitutional Wisconsin's statutory scheme for confining insanity acquittees. This statutory scheme limits the insanity acquittee's term of confinement to the maximum he could have received for the underlying criminal conduct, places the burden on the State to prove by clear and convincing evidence that the commitment should continue, and confines the acquittee in a structured environment that seeks to treat the acquittee's mental illness or behavioral disability that makes him dangerous.

Stowe's petition has been referred to me by the presiding judge, William Conley, for report and recommendation.  As explained in more detail below, I recommend that the court deny Stowe's petition.  Stowe has not identified any clearly established Supreme Court law that prevents a State from confining a sane-but-dangerous insanity acquittee under a statutory scheme like Wisconsin's.  Accordingly, he has failed to show that he qualifies for federal habeas relief under 28 U.S.C. § 2254.

BACKGROUND

## I. Wisconsin's Statutory Scheme for Insanity Acquittees

Wisconsin recognizes that "a person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law." Wis. Stat. § 971.15(1). In recognition of this fact, a defendant charged with a crime may plead not guilty by reason of mental disease or defect, commonly referred to as an "NGI" plea. Wis. Stat. § 971.06(1); *State v. Fugere*, 2019 WI 33, ¶ 1, 386 Wis. 2d 76, 86, 924 N.W.2d 469, 473. Unless joined with a plea of not guilty, such a plea "admits that but for lack of mental capacity the defendant committed all the essential elements of the offense charged in the indictment, information or complaint." *Id*. "The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." Wis. Stat. § 971.15(3).

If the defendant's NGI defense succeeds, then the court enters a judgment of not guilty by reason of mental disease or defect and "shall thereupon proceed under s. 971.17." Wis. Stat. § 971.165(3)(b). Under Wis. Stat. § 971.17(1)(b),

> When a defendant is found not guilty by reason of mental disease or mental defect of a felony committed on or after July 30, 2002, the court shall commit the person to the department of health services ["DHS"] for a specified period not exceeding the maximum term of confinement in prison that could be imposed on an offender convicted of the same felony[.]

Under Wis. Stat. § 971.17(3)(a), the court shall order institutional care if it finds "by clear and convincing evidence that conditional release of the person would pose a significant risk

of bodily harm to himself or herself or to others or of serious property damage.  If the court does not make this finding, then it must order conditional release.  *Id*.  If the court order specifies institutional care, then "the department of health services shall place the person in an institution . . . that the department considers appropriate in light of the rehabilitative services required by the person and the protection of public safety."  Wis. Stat. § 971.17(3)(c).

Under the statute, a person committed for institutional care may petition the committing court to modify its order by authorizing conditional release "if at least 6 months have elapsed since the initial commitment order was entered, the most recent release petition was denied or the most recent order for conditional release was revoked." Wis. Stat. § 971.17(4).  Within 20 days after receipt of the petition, the court shall appoint one or more examiners, at state expense, to assess the person's appropriateness for conditional release and to furnish a report to the court.  Within 30 days after the report is filed, the court must hear the petition, and must grant it "unless it finds by clear and convincing evidence that the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage if conditionally released."  *Id*.

> In making this determination, the court may consider, without limitation because of enumeration, the nature and circumstances of the crime, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, what arrangements are available to ensure that the person has access to and will take necessary medication, and what arrangements are possible for treatment beyond medication.
>
> *Id*.

## II.  Jones v. United States

In *Jones v. United States*, 463 U.S. 354 (1983), the Court considered whether a person committed to a mental hospital after an insanity verdict must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted.  Although Stowe makes no such claim here, an examination of *Jones* is helpful before turning to *Foucha*.

Jones was charged in the District of Columbia Superior Court with attempted petit larceny, a misdemeanor punishable by a maximum prison sentence of one year.  *Id*. at 359. The Superior Court found petitioner not guilty by reason of insanity and committed him to a mental hospital under the District of Columbia's statutory scheme.  *Id*. at 360.  Under this scheme, an insanity acquittee was entitled within 50 days of his commitment to a judicial hearing to determine his eligibility for release, at which he had the burden of proving by a preponderance of the evidence that he was no longer mentally ill or dangerous. *Id*. at 357.  The district's code also provided that the acquittee was entitled to a judicial hearing every six months at which he may establish by a preponderance of the evidence that he is entitled to release.  *Id*.

At Jones's 50-day hearing, the court found that he was mentally ill and constituted a danger to himself or others.  *Id*. at 360.  A second release hearing was held after Jones had been hospitalized for more than one year, the maximum period he could have spent in prison had he been convicted.  *Id*.  Jones demanded that he be released unconditionally or recommitted pursuant to the civil-commitment procedures under the District of Columbia Code, including a jury trial and clear and convincing proof by the Government

of his mental illness and dangerousness.  *Id*.  The Superior Court denied his request for a civil-commitment hearing, reaffirmed the findings made at the 50-day hearing, and continued his commitment.  *Id*. at 360-61.  The District of Columbia Court of Appeals ultimately affirmed.  *Id*. at 361.

The Supreme Court granted certiorari to decide "whether petitioner, who was committed to a mental hospital upon being acquitted of a criminal offense by reason of insanity, must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted."  *Id*. at 356.  The Court, while noting the well-established principle that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *id*. at 361 (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)), concluded that a "finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society."  463 U.S. at 366.  The Court then rejected Jones's constitutional argument that the state court could not hold him beyond the date he would have been released if convicted by a jury, explaining that "[d]ifferent considerations underlie commitment of an insanity acquittee" than punishment of persons convicted of crimes. *Id*. at 369.  The Court held that an acquittee's continued confinement was constitutional "on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Id*. at 370.

### III.  Foucha v. Louisiana

Jones did not challenge the constitutionality of the District's procedures for release, nor did he seek release based on non-illness or non-dangerousness.  *Id*. at 363 n. 11.  That type of challenge arose in *Foucha v. Louisiana*, 504 U.S. 71 (1992).  Petitioner Terry Foucha was charged by Louisiana authorities with aggravated burglary and illegal discharge of a firearm.  *Id*. at 73.  Based on the testimony of two medical doctors, the trial court ruled that Foucha was not guilty by reason of insanity, finding that he "is unable to appreciate the usual, natural and probable consequences of his acts; that he is unable to distinguish right from wrong; that he is a menace to himself and others; and that he was insane at the time of the commission of the above crimes and that he is presently insane." *Id*. at 74. The trial court committed Foucha to the East Feliciana Forensic Facility until such time as doctors recommended that he be released, and until further order of the court.  *Id*.

About four years later, the superintendent of Feliciana recommended that Foucha be discharged or released.  *Id*.  A three-member panel convened at the institution to evaluate Foucha reported that there had been no evidence of mental illness since admission and recommended that Foucha be conditionally discharged, but it did not expressly make a finding on the question of dangerousness.  *Id*., n.2.  The trial judge appointed a two-member sanity commission made up of the same two doctors who had conducted the pretrial examination. In their report, these doctors stated that Foucha "is presently in remission from mental illness [but] [w]e cannot certify that he would not constitute a menace to himself or others if released." *Id*., at 74-75.  Elaborating at a hearing, one of the doctors testified that Foucha:  (1) probably suffered from a drug induced psychosis at the

time of his initial commitment, but had recovered from that temporary condition; (2) evidenced no signs of psychosis or neurosis and was in "good shape" mentally; (3) had an antisocial personality, a condition that is not a mental disease and that is untreatable; and (4) had been involved in several altercations at Feliciana.  Ultimately, the doctor said that he would not "feel comfortable in certifying that [Foucha] would not be a danger to himself or to other people." *Id*. at 75.  After it was stipulated that the other doctor, if he were present, would give essentially the same testimony, the court ruled that Foucha was dangerous to himself and others and ordered him returned to the mental institution.  *Id*. at 75.  Louisiana's appellate courts affirmed the trial court, and the United States Supreme Court granted certiorari.

The Court considered whether Louisiana's statutory scheme of recommitment of insanity acquittees violated due process and equal protection because it allowed "a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness." *Id*. at 73.  The Court described Louisiana's scheme:

> When a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous. This is so whether or not he is then insane. After commitment, if the acquittee or the superintendent begins release proceedings, a review panel at the hospital makes a written report on the patient's mental condition and whether he can be released without danger to himself or others. If release is recommended, the court must hold a hearing to determine dangerousness; the acquittee has the burden of proving that he is not dangerous. If found to be dangerous, the acquittee may be returned to the mental institution whether or not he is then mentally ill.

*Id*.

Joined by four justices, Justice White concluded that Louisiana's scheme violated due process.[1]  First, the Court noted that in *Jones*, it had held that "the Constitution permits the Government, on the basis of the insanity judgment, to confine [an insanity acquittee] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society . . . *i.e.*, the acquittee may be held as long as he is both mentally ill and dangerous, but no longer."  504 U.S. at 77, citing *Jones*, 463 U.S. at 368.  The Court rejected the lower court's view that this language from *Jones* was limited to the specific statutory scheme at issue in that case and therefore had no constitutional significance.  *Id*.  To the contrary, wrote the Court, because it was undisputed that Foucha was not mentally ill at the time of the lower court's hearing, under *Jones* "the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis."  *Id*. at 78.

The Court also rejected Louisiana's alternative contention that it could "perpetuate Foucha's confinement at [a psychiatric hospital] on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the court found rendered him a danger to himself or others."  *Id*. at 78.  First, even if Foucha's continued confinement were constitutionally permissible, keeping him against his will in a mental institution was inappropriate absent a determination in civil commitment proceedings that he was mentally ill, with "constitutionally adequate procedures to establish the grounds for his

---

[1] Justice White also concluded that Louisiana's scheme violated the Equal Protection Clause, but only three justices joined that part of his opinion.

confinement." *Id*. at 78-79.  Because Louisiana conceded that Foucha was not suffering from a mental disease or illness, and because due process "requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed," if Foucha was to be held, then he should not be held as a mentally ill person. *Id*. at 79.

Second, the Court found that Louisiana had no punitive interest in Foucha's continued confinement: by reason of his insanity acquittal, Foucha was exempt from criminal responsibility for his acts and could not be punished.  *Id*. at 80.

Next, the Court distinguished Louisiana's scheme of confinement from the confinement of pretrial detainees allowed by the Bail Reform Act of 1984, which the Court had upheld in *United States v. Salerno*, 481 U.S. 739 (1987).  The Court explained that in contrast with the "sharply focused scheme" at issue in *Salerno*, Louisiana did not provide Foucha with an adversary hearing at which the State must prove by clear and convincing evidence that he was demonstrably dangerous to the community.  To the contrary, the burden was on Foucha to prove that he was *not* dangerous.  *Id.* at 81-82.

The Court also noted that if Foucha had committed criminal acts, such as assault, while housed in the mental institution, then the State could vindicate its interest by using ordinary criminal process.  *Id*.  Finally, the Court noted that the detention found permissible in *Salerno* was "strictly limited in duration," whereas Louisiana was asserting that because "Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely." *Id*. at 82.  Accordingly, found the Court,

Louisiana's detention scheme for sane-but-dangerous insanity acquittees did not fall within the "carefully limited exceptions" allowed by the Due Process Clause. *Id.* at 83.

Justice O'Connor cast the fifth and deciding vote. Although she agreed with the majority that Louisiana's scheme violated the Due Process Clause, she wrote separately to emphasize the limitations of the Court's holding:

> Louisiana asserts that it may indefinitely confine Terry Foucha in a mental facility because, although not mentally ill, he might be dangerous to himself or to others if released. For the reasons given in Part II of the Court's opinion, this contention should be rejected. I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite confinement of sane insanity acquittees in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws that provide for detention of insanity acquittees, or on statutes that provide for punishment of persons who commit crimes while mentally ill.
>
> I do not understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health.

*Id*. at 86–87 (O'Connor, J., concurring).

Justice O'Connor pointed out that the insanity defense becomes relevant only after the prosecution establishes beyond a reasonable doubt that the defendant committed criminal acts with the required level of intent. *Id*. at 87. This finding of criminal conduct, she explained, set insanity acquittees apart from ordinary citizens and provides "concrete evidence" of dangerousness. *Id*. in 87. In contrast, she noted, the state of knowledge about mental disease was uncertain. This uncertainty, she wrote, required courts to "'pay particular deference to reasonable legislative judgments' about the relationship between dangerous behavior and mental illness." *Id*. at 87 (quoting *Jones*, supra, 463 U.S., at 365,

n. 13.)  In her view, then, it might be permissible for Louisiana to confine an insanity acquittee who has regained sanity "if the nature and duration of detention were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness." *Id*. at 87-88.  To confine an acquittee as a mental patient, however, the State would require "some medical justification for doing so."  *Id*. at 88.

Finally, responding to Justice Thomas's assertion in his dissenting opinion that 11 states—including Wisconsin--had laws comparable to Louisiana's, *see id.*, at 112 & n.9, Justice O'Connor found that number to be overstated.  She noted that California and Vermont had amended their laws to provide for the release of acquittees who do not suffer from mental illness but may be dangerous, and that Wisconsin, New Jersey and Washington "limit the maximum duration of criminal commitment to reflect the acquittee's specific crimes and hold acquittees in facilities appropriate to their mental condition." *Id*. at 89 (citing Wis. Stat. §§ 971.17(1), (3)(c) (Supp.1991)). Such laws, wrote Justice O'Connor, were not necessarily invalid under the Court's opinion.  *Id*.

## IV.  The Wisconsin Supreme Court's Decision in Randall

Three years later, in *State v. Randall*, 192 Wis. 2d 800, 532 N.W.2d 94 (1995), the Wisconsin Supreme Court was asked to decide whether Wisconsin's statutory commitment scheme for insanity acquittees, "which allows the state to confine an insanity acquittee who is no longer mentally ill, solely on the grounds that the individual is a danger to himself, herself or others," violated the Due Process Clause of the United States Constitution.  *Id*. at 806, 532 N.W. 2d at 96.  The court's answer was a qualified "no." After explicating the Supreme Court's precedents on post-acquittal confinement, including

*Jones* and *Foucha*, the Wisconsin Supreme Court concluded that *Foucha* permitted the continued confinement of insanity acquittees based on dangerousness alone, provided that "the nature of the commitment bears some reasonable relation to the purposes for which the individual is committed." 192 Wis. 2d at 832, 532 N.W. 2d at 107. In reaching this conclusion, the Wisconsin Supreme Court read Justice O'Connor's concurrence as having "left the door open" to this possibility in her statement quoted above. *Id*. at n.22 (citing *Foucha*, 504 U.S. at 87-88).

Observing that behavioral disorders that render a person dangerous may continue even after the person recovers from mental illness, *id*. at 808, the court concluded that Wisconsin's scheme satisfied the "tailoring requirement" because Wisconsin's two mental health institutions designated for the treatment of insanity acquittees both were therapeutically and behaviorally oriented to reduce their patients' propensities for dangerousness. *Id*. Further, insanity acquittees qualified as "patients" under Wisconsin's Patient's Rights statute, which afforded them certain rights. *Id*. Ultimately, the court concluded that

> the legislature has determined that the treatment programs made available to insanity acquittees in Wisconsin—regardless of whether administered by the state or the county—are not limited to the medical or pharmacological needs of the patient. This state's statutory scheme provides a structured environment which seeks to treat both the acquittee's mental and behavioral disorders.
>
> To the extent that insanity acquittees continue to receive treatment during their confinement at Mendota or Winnebago---whether that treatment is geared to reducing clinical symptoms of mental illness or behavioral disabilities which render the acquittee dangerous—we find there is sufficient medical justification to continue the confinement

and treatment. Accordingly, we hold that sec. 971.17(2), Stats., (1987–88) does not violate due process because we conclude there is a reasonable relationship between the nature of the commitment and the purposes for which the individual is committed.

*Id.*, 192 Wis. 2d at 837–38, 532 N.W.2d at 108.

The Wisconsin Supreme Court noted that, in contrast with *Foucha*, where Louisiana had conceded that Foucha was not mentally ill and suffered only from an untreatable antisocial personality disorder, Wisconsin had made no similar concession with respect to Randall. *Id*. at n. 19. The Wisconsin Supreme Court also noted two critical procedural differences between Louisiana's scheme and Wisconsin's: first, under Louisiana's scheme, an insanity acquittee could be held in a mental institution "for an indefinite and unlimited duration," while Wisconsin's statute limited the term of confinement to the maximum term of imprisonment that could have been imposed for the offenses charged. *Id*. at 808, 532 N.W. 2d at 97. Second, Louisiana placed the burden on the insanity acquittee to prove, by a preponderance of the evidence, that he or she no longer was dangerous, whereas Wisconsin's statute put the burden on the State to prove continued dangerousness by clear and convincing evidence. *Id*. These features provided sufficient procedural safeguards to insure a Wisconsin acquittee's right to due process. *Id*.

Summing up, the Wisconsin Supreme Court concluded that a "single standard for commitment, based on dangerousness alone, is permissible" under the Due Process Clause if three criteria are met: (1) the maximum duration of the commitment is limited to reflect the acquittee's specific crimes; (2) the State bears the burden of proof at a recommitment or release hearing; and (3) the State must confine the acquittee "in a facility appropriate

to his or her mental condition." *Id*., 192 Wis. at 841, 532 NW. 2d at 110. Because Wisconsin's statutory scheme satisfied all three criteria, it was constitutionally permissible. *Id*. And in fact, noted the court, Justice O'Connor provisionally approved statutes such as Wisconsin's in her concurrence. *Id*. at 839-40, 532 N.W.2d at 109 (citing *Foucha*, 504 U.S. at 89).

Concurring in the decision to remand the case to the circuit court, Justice Shirley Abrahamson observed that the majority appeared to have grafted onto Wis. Stat. § 971.17 the requirement that a mental illness *or* behavioral disability that rendered the acquittee dangerous must be present to justify continued confinement. *Randall*, 192 Wis. 2d at 842, 532 N.W. 2d at 110 (Abrahamson, J., concurring in the mandate). Although Justice Abrahamson appeared to agree that interpreting the statute this way could satisfy the requirement that the nature of the confinement bear a reasonable relationship to the purpose for which the individual was confined, *id*., she declined to join the opinion because in her view, *Foucha* held that the State could not confine an acquittee unless the mental condition was one on which an insanity commitment could be based. *Id*. She acknowledged, however, that *Foucha* was "a troublesome decision" that was subject to "conflicting interpretations by courts and commentators." *Id*., at 843, 532 N.W. 2d at 111.

## V. Stowe's Confinement

Stowe's confinement arises from events that occurred on February 9, 2004. The Wisconsin Court of Appeals described these events in its December 2017 decision affirming the denial of Stowe's petition for conditional release, and they are not in dispute. *State v.*

*Stowe*, 2018 WI App 8, ¶ 17, 379 Wis. 2d 767, 909 N.W.2d 210.

On February 9, 2004, Stowe entered his ex-girlfriend's residence and forced her and their two-year-old daughter out of bed at gunpoint. Stowe subsequently tied up and handcuffed his ex-girlfriend, her minor brother, and her father. He beat her father with a baton and doused him with gasoline and stated repeatedly that he was going to take his ex-girlfriend somewhere and force her to watch him commit suicide. He also threatened to kill her father and sister. Stowe's ex-girlfriend was ultimately able to call 911, and later escaped with her daughter after police arrived at the residence. While police remained outside the residence, Stowe took some pills—after again indicating he wanted to kill himself—and then passed out. His ex-girlfriend's father and brother then were able to escape, and police took Stowe into custody.

The State charged Stowe with 11 counts in connection with these events, to which Stowe entered pleas of not guilty by reason of mental disease or defect (NGI). He subsequently entered no contest pleas to first-degree recklessly endangering safety, intimidation of a victim, felony bail jumping, and three counts of false imprisonment. The circuit court found Stowe NGI with respect to those offenses, and the remaining charges were dismissed. The court ordered Stowe committed to the Department of Health and Family Services for institutional care for 39 years and six months.

At the time he committed the offenses, Stowe was experiencing "auditory hallucinations that were giving him the message to kill himself," and he had been diagnosed with a mood disorder with psychotic features.

Stowe was conditionally released in April 2007 but was revoked in July 2009 and

returned to DHS custody.  Stowe petitioned for conditional release three times between 2010 and 2012, but each time was denied.  In July 2013, Stowe escaped from a minimum-security unit at Mendota Mental Health Institute and evaded capture for more than three months. He was subsequently convicted of escape and sentenced to prison. After serving the initial confinement portion of his sentence, Stowe was returned to Mendota to serve the extended supervision portion of his escape sentence concurrently with his commitment. He was placed in a maximum-security unit.

## VI.  Stowe's February 2016 Petition for Conditional Release

The subject of this habeas petition is a petition for conditional release that Stowe filed in February 2016.  The circuit court held a hearing at which it heard from two court-appointed psychologists who had evaluated Stowe (Dr. William Merrick and Dr. Kevin Miller), a staff psychiatrist at Mendota (Dr. Elliot Lee), and Stowe's wife.  In addition, Stowe's treatment team at Mendota submitted a letter to the court, and Stowe read a statement in support of his conditional release.

Dr. Miller testified that Stowe's narcissism created a risk of him "doing something impulsive," citing Stowe's prior escape from Mendota as an example. While Dr. Merrick reported that Stowe had not shown evidence of any mood disorder or psychotic symptoms for many years and had not required psychiatric medications to manage symptoms of any mental illness in over ten years, he and Dr. Lee both opined that Stowe met the diagnostic criteria for "Other Specific Personality Disorder, with Narcissistic and Antisocial Features." Dr. Miller also indicated that antisocial personality characteristics "are associated with higher risk of violence when compared with typical or average individuals."  *Id.* at ¶ 16.

While Dr. Miller testified antisocial behaviors tend to decrease when a person reaches age forty, Dr. Merrick, testified that narcissism, Stowe's "prominent . . . maladaptive personality trait, does not show the same age-related decline." *Id*. at ¶ 17.

After the hearing, the circuit court found the State had met its burden to prove, by clear and convincing evidence, that Stowe would pose a significant risk of bodily harm to himself or others if he were conditionally released.

## VII.   Wisconsin Court of Appeals' Decision

Stowe appealed, raising three claims:  (1) the evidence was insufficient to support the circuit court's finding of continued dangerousness; (2) Wis. Stat. § 971.17(4)(d) was unconstitutional as applied to him because he was no longer mentally ill and he was not receiving therapeutic benefit from his confinement at Mendota; and (3) Wis. Stat. § 971.17(4)(d) was unconstitutional on its face because it permitted the continued confinement of an NGI acquittee based on dangerousness alone.  *Id*. at ¶¶ 2-6.

The Wisconsin Court of Appeals rejected Stowe's arguments and affirmed the circuit court. It determined that Stowe had forfeited his as-applied constitutional challenge based on lack of therapeutic benefit by failing to raise it in the circuit court.  *Id*. at ¶ 34. The court rejected Stowe's suggestion that it review the claim in its discretion or under the plain error doctrine, noting that the merits of his as-applied claim depended on facts that had not been developed below, and that Stowe would have the opportunity to raise his argument when he next petitioned the circuit court for conditional release.  *Id*. at ¶¶ 35-

36.[2] As for Stowe's facial challenge to the conditional release statute, the Wisconsin Court of Appeals found it foreclosed by the Wisconsin Supreme Court's decision in *Randall*, which the court of appeals had no power to overrule or modify. *Id*. at ¶ 39. Finally, it concluded that the evidence presented at Stowe's conditional release hearing was "more than sufficient" to support the circuit court's determination that the State proved, by clear and convincing evidence, that Stowe would pose a significant risk of bodily harm to himself or others if conditionally released. *Id*. at ¶ 27.

Stowe petitioned the Wisconsin Supreme Court for review and raised both his facial and as-applied challenges to Wis. Stat. § 971.17(4)(d). He argued that the court should overturn *Randall* as inconsistent with the United States Supreme Court's decision in *Foucha*. The Wisconsin Supreme Court summarily denied Stowe's petition for review on April 9, 2018. Stowe subsequently filed this timely petition for a writ of habeas corpus.

## ANALYSIS

Stowe repeats his claim that Wisconsin's statutory scheme concerning commitment of insanity acquittees is unconstitutional on its face because it permits the continued

---

[2] Stowe filed another petition for conditional release in December 2016, in which he properly preserved a claim that Wis. Stat. § 971.17(4) was unconstitutional as applied to him because his continued confinement at Mendota had no therapeutic value. Considering that argument on appeal, the Wisconsin Court of Appeals rejected it based on its decision in *State v. Randall*, 222 Wis. 2d 53, 586 N.W. 2d 318 (Ct. App. 1998) (*Randall II*), which had interpreted *Randall I* as establishing -- as a matter of law -- that there is a "therapeutic value to confining a [currently] sane but dangerous acquittee to one of this state's mental health facilities." *State v. Stowe*, 2019 WI App 39, ¶ 18, 388 Wis. 2d 256, 932 N.W.2d 179. I do not understand Stowe to be pursuing any claim based on "lack of therapeutic value" in this proceeding. Even if he is, I would find that claim procedurally defaulted for the reasons set out in the State's brief, dkt. 9, at 11-12, which Stowe does not contest.

confinement of an acquittee after he regains his sanity.  A few preliminary matters require discussion before I address the merits.

First, when Stowe argues that he has "regained his sanity" or is "no longer mentally ill," I understand him to be contending that he no longer suffers from either the mood disorder that he had at the time he committed the underlying offenses or any other mental condition that Wisconsin recognizes would support an NGI plea in the first place.  The State does not dispute this.  However, there is also no dispute that Stowe has been diagnosed with a different mental disorder, namely "Other Specific Personality Disorder, with Narcissistic and Antisocial Features."  I understand Stowe's claim to be that *Foucha* prohibits Wisconsin from keeping him confined at Mendota pursuant to his NGI commitment even for the purpose of treating his personality disorder.

Second, although circuit court records show that Stowe has had a number of conditional release hearings since the 2016 hearing at issue in this petition, he has lost them all.  Stowe remains housed at Mendota, and *Randall* remains the law in Wisconsin.  *See* 2004CF000124 Case Details in Brown County (wicourts.gov).  Accordingly, this petition is not moot.

Third, I reject Stowe's suggestion that this court review his claim *de novo*, disposing of the matter "as law and justice require," 28 U.S.C. § 2243, rather than under the deferential provisions of AEDPA, which apply only to claims "adjudicated on the merits in State court proceedings."  § 2254(d).  Stowe asserts, cursorily, that *de novo* review is warranted because the Wisconsin Court of Appeals "declined to address the merits" of his facial challenge.  Br. in Supp., dkt. 7, at 8.  I disagree.  As noted above, the Wisconsin

Court of Appeals explained that the Wisconsin Supreme Court already had found Wisconsin's statutory scheme constitutional in *Randall,* a decision by which the lower court was bound. Plainly, the Wisconsin Court of Appeals did not overlook a claim with constitutional dimensions; rather, it noted that this claim already had been decided and rejected by the state supreme court. This constitutes an "adjudication on the merits," so AEDPA deference applies. *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Under AEDPA's provisions, this court cannot grant Stowe's petition for habeas relief unless the Wisconsin Court of Appeals' adjudication of Stowe's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). [3] The Wisconsin Court of Appeals rejected Stowe's facial due process challenge, relying entirely on *Randall*. Thus, I apply AEDPA's provisions to the Wisconsin Supreme Court's decision in *Randall*, which the parties agree controls the outcome in this case.

Stowe argues that *Randall*'s determination that Wisconsin's statutory scheme for confining insanity acquittees is contrary to *Foucha*. A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule different from

---

[3] Stowe does not argue that the state appellate court's decision was based on any unreasonable determination of the facts, so I do not consider whether he would be eligible for relief under § 2254(d)(2).

the governing law as set forth in Supreme Court cases, or if it decides a materially indistinguishable case differently than the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). Stowe argues that *Foucha* clearly established a rule that a State must release an insanity acquittee once he regains sanity or is no longer dangerous. Stowe further argues that his case is indistinguishable because, like Foucha, he has recovered from his mental illness and he suffers only from an antisocial personality disorder, which the Court ruled was not enough to permit Foucha's continued confinement under his insanity acquittal.

The State, on the other hand, asserts that *Foucha*'s holding must be viewed through the lens of Justice O'Connor's concurrence, which expressly rejected Stowe's formulation of the rule and which reasonably supports the Wisconsin Supreme Court's determination that Wisconsin's statutory scheme comports with due process.

As an initial matter, I agree with Stowe that *Foucha* does not call for application of the *"Marks"* rule, which holds that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United* States, 430 U.S. 188, 193 (1977) (internal quotation marks and citation omitted). As Stowe points out, Justice O'Connor expressly agreed with the reasons provided by the majority for declaring that Louisiana could not keep Foucha confined in a mental institution based solely on dangerousness. Therefore, *Marks* does not seem to apply here. *See Vasquez v. Hillery*, 474 U.S. 254, n.4 (1986) (describing the *Marks* rule as "inapplicable" to an opinion "to which five Justices expressly

subscribed").

Nevertheless, even if Stowe is correct that Justice O'Connor's concurrence is not "controlling," that does not make it irrelevant to the analysis. To the contrary, given that Justice O'Connor's vote was essential to providing a majority opinion, her decision provides important insight into the scope of that holding. *McKoy v. North Carolina*, 494 U.S. 433, 462, n.3 (1990) (where an individual Justice is needed for the majority, "the opinion is *not* a majority opinion except to the extent that it accords with his views.") (Scalia, J., dissenting). Here, it is fair to infer that if the majority opinion actually *did* hold that a state "may never confine dangerous insanity acquittees after they regain mental health," then presumably Justice O'Connor would not have joined it. Her understanding of the limitations of the majority's holding cannot be ignored.

Contrary to Stowe's interpretation, Justice O'Connor's concurrence makes clear that *Foucha* did not establish any hard-and-fast rule that a State must release a dangerous insanity acquittee once he recovers his sanity. Rather, as she expressly stated, *Foucha*'s holding was limited to "the specific statutory scheme before us" and did not apply to "more narrowly drawn laws that provide for detention of insanity acquittees[.]" Foucha, 504 U.S. at 86-87.

As noted above, Wisconsin's scheme differs from Louisiana's in two material respects. First, unlike Wisconsin's statute, Louisiana's statute did not limit the maximum term of confinement to the maximum term of imprisonment that could have been imposed for the offenses charged, but instead allowed for "indefinite" confinement. Thus, Louisiana's scheme, at least as described by the *Foucha* majority, was like that at issue in

*Jones*, from which the Supreme Court pulled its broad language declaring that a State could confine an insanity acquittee only until such time as he had regained his sanity or was no longer dangerous.  Second, Louisiana placed the burden on the insanity acquittee to prove, by a preponderance of the evidence, that he or she was no longer dangerous.  In Wisconsin, the State must prove an NGI acquittee's continued dangerousness by clear and convincing evidence, and the acquittee may request reexamination and a release hearing at state expense at periodic intervals.  Given that Wisconsin's scheme is "more narrowly drawn" than Louisiana's, it is not necessarily unconstitutional under *Foucha*.

Stowe does not deny that Wisconsin's statute differs from Louisiana's, but he offers two reasons why the Wisconsin Supreme Court got *Foucha* wrong in *Randall*.  First, Stowe points out that the *Randall* court appears to have made a factual error when it said that "[u]nlike Louisiana's scheme," Wisconsin required the State to prove guilt beyond a reasonable doubt before the NGI defendant was entitled to a hearing on insanity.  Br. in Supp., dkt. 7, at 14 (citing *Randall*, 192 Wis. 2d at 107, 532 N.W. 2d at 833).  As Stowe points out, as described by both Justice O'Connor and the dissent, Louisiana *did* require the State to prove "beyond a reasonable doubt that the defendant committed criminal acts with the required level of intent" before the defendant may assert an insanity defense. *Foucha*, 504 U.S. at 87 and 92.

But Stowe does not develop any argument as to why that mistake matters.  Notably, the *Randall* court did not appear to place any particular legal significance on this fact except to note that the requirement of proof beyond a reasonable doubt provided the basis for the State to incapacitate and treat the insanity acquittee, a proposition with which Justice

O'Connor appeared to agree.  *Id.* (noting that finding of criminal conduct by insanity acquittees "sets them apart from ordinary citizens."); *see also Jones*, 463 U.S. at 370 ("Insanity acquittees constitute a special class that should be treated differently from other candidates for commitment.").  Moreover, the fact that Wisconsin's and Louisiana's statutes both require proof beyond a reasonable doubt for initial commitment does not diminish the significance of the ways in which the statutes differ in their treatment of insanity acquittees *after* commitment.

Stowe's second and stronger argument is that the fairness of Wisconsin's procedures has nothing to do with *Foucha*'s *substantive* due process requirement that the "nature of the commitment bear some reasonable relation to the purpose for which the individual is committed."  In Stowe's view, *Foucha* held that a sane insanity acquittee can never be held in a mental institution, regardless of the fairness of the procedures used.

Once again, Justice O'Connor's concurrence defeats Stowe's argument.  Justice O'Connor wrote that she did *not* "understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health."  *Id.* at 87.  Rather, she wrote, it might "be permissible for [a State] to confine an insanity acquittee who has regained sanity if, unlike the situation in this case, the nature and duration of detention were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness."  *Id.* at 87-88.  Justice O'Connor specifically identified Wisconsin's statute as one that seemed to meet this requirement.  *Id.* at 89.  Finally, Justice O'Connor suggested that an insanity acquittee could be confined as a mental patient if there was "medical justification for doing so."  *Foucha*, 504 U.S. at 88.

In light of this language, it is impossible to conclude that the Wisconsin Supreme Court erred, much less was unreasonable, in concluding that Justice O'Connor "left the door open to the possibility of continuing the commitment of a sane but dangerous acquittee to a facility, other than a prison or a hospital[.]" *Randall*, 192 Wis. 2d at 832 n.22, 532 N.W. 2d at 106 n.22. To the contrary, as another jurist has observed, "If one of the five Justices in the *Foucha* majority understood the decision to mean that there was no hard-and-fast rule that a State must release a dangerous insanity acquittee once he regains mental health, then it is not an unreasonable application of clearly established federal law for a state court to believe the same." *Grass v. Reitz*, 643 F.3d 579, 588 (8th Cir. 2011) (J., Colloton, concurring in judgment); *see also State v. Tooley*, 875 S.W.2d 110, 113 n. 4 (Mo.1994) (declining to decide "whether it would be constitutionally permissible to confine a sane person based on dangerousness alone," but noting that "Justice O'Connor did indicate in *Foucha* that this may be constitutional."). *But see Revels v. Sanders*, 519 F.3d 734, 742 (8th Cir. 2008) ("[T]he rule urged by the respondent, that a state may continue to hold an insanity acquittee who seeks unconditional release even if he is not presently mentally ill, must be rejected.").

Ultimately, the Wisconsin Supreme Court was satisfied that Wisconsin's scheme was sufficiently tailored "to reflect pressing public safety concerns related to the acquittee's continuing dangerousness" because its two mental health institutions designated for the care and confinement of insanity acquittees, Mendota and Winnebago, were structured to provide treatment for both mental and behavioral disorders and offered comprehensive treatment programs designed to reduce the patient's propensity for dangerousness. *Id*. at

843-37, 532 N.W. 2d at 107-08.  Given the structural differences between Louisiana's and Wisconsin's scheme and Justice O'Connor's stated understanding of the limitations of the majority opinion in *Foucha*, I cannot say that this conclusion was contrary to or an unreasonable application of *Foucha*.

Stowe cites two decisions from the Seventh Circuit describing *Foucha* as holding that "a person committed because of an insanity verdict is entitled to release when he recovers his sanity or is no longer dangerous."  Br. in Supp., dkt. 7, at 11, quoting *Gilbert v. McCulloch*, 776 F.3d 487, 494 (7th Cir. 2015); *see also Adams v. Bartow*, 330 F.3d 957, 961 (7th Cir. 2003) ("[T]he general rule we take from *Foucha* is simply that an insanity acquittee may be held for only as long as he is still mentally ill; his dangerous propensities alone do not justify continued confinement.").  However, in both *Gilbert* and *Adams*, the court was considering challenges to Wis. Stat. Chapter 980, which provides a process for the indefinite civil commitment of sexually violent persons, not to the limited-term confinement pursuant to an NGI determination that Stowe challenges in this case. Accordingly, the court's general description of *Foucha*'s majority holding in these two cases cannot be understood as establishing that Stowe has a clearly established right to be released in this case.  *Brown v. Davenport*, ___ U.S. ___, 142 S. Ct. 1510, 1525 (2022) ("Clearly established federal law as determined by the Supreme Court of the United States" means just that:  it does not include lower federal court decisions, the Supreme Court's dicta, or holdings that "speak only at a high level of generality.") (citations omitted).  In fact, the *Adams* court noted that *Foucha*'s holding rested on "a specific combination of factors," including that the "the state had not shown that Foucha was dangerous and in

fact had no obligation to do so because its statute placed the burden on the individual to show that he was not dangerous." *Id.*, 330 F.3d at 960.  Again, the "specific combination" of factors present in *Foucha* are absent in Stowe's case, as they were in *Randall*.

To be sure, as Justice Thomas noted in his dissenting opinion, it is not clear *where* Justice O'Connor thought sane-but-dangerous acquittees could be confined, if not in a mental health facility.  *Foucha*, 504 U.S. at 125 ("I have no idea what facilities the Court or Justice O'CONNOR believe the Due Process Clause mandates for the confinement of sane-but-dangerous insanity acquittees.").  As the *Randall* court noted, one commentator inferred that Justice O'Connor had in mind "dangerous person" facilities.  *Randall*, 192 Wis. 2d at 832 n. 22, 532 N.W.2d at 106 n.22 (citing Rebecca Frank Dallet, FOUCHA v. LOUISIANA: THE DANGER OF COMMITMENT BASED ON DANGEROUSNESS, 44 Case W. Res. L. Rev. 157, 181 (Fall, 1993)).  But these ambiguities only shore up the conclusion that federal habeas relief is unavailable to Stowe. "A federal court may grant habeas relief only if a state court violated '*clearly established* Federal law, as determined by the *Supreme Court* of the United States.'" *Dunn v. Reeves*, ___ U.S. ___, 141 S. Ct. 2405, 2410–11 (2021) (citing § 2254(d)(1), (emphasis in original).  A right is not "clearly established" until the United States Supreme Court has made it "concrete." *Bland v. Hardy*, 672 F.3d 445, 448 (7th Cir. 2012) (citing *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008)).  I agree with the State that *Foucha* did not establish that a dangerous-but-sane insanity acquittee has a concrete right to be conditionally released from a mental health

facility that offers treatment designed to overcome that which makes him dangerous.[4]

On reply, Stowe argues that even if it was not unreasonable for the Wisconsin Supreme Court to conclude that the State may confine a sane-but-dangerous insanity acquittee so long as the State is medically justified in doing so, Wisconsin's scheme is nonetheless unconstitutional because it presumes medical justification regardless of individual circumstances.  Dkt. 11, at 7 (citing *State v. Randall*, 586 N.W. 2d 318 (Ct. App. 1998) (*Randall II*).  However, Stowe has waived this argument.  He did not raise it until reply and he hasn't supported it with any citations to a Supreme Court case that clearly establishes a right to an individualized determination of medical justification.  *United States v. White*, 8 F.4th 547, 552 (7th Cir. 2021) (arguments raised for first time on reply and unsupported by pertinent authority are waived).  Moreover, Stowe did not present this argument in the state court proceedings, so it is procedurally defaulted.  *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014) (federal claim is "procedurally defaulted when a petitioner fails to 'fairly present' [the] claim to the state courts.").

Finally, in a fallback argument, Stowe argues that his confinement is unlawful under *Kansas v. Hendricks*, 521 U.S. 346 (1997), because Wisconsin did not prove at his conditional release hearing that he suffers from a mental abnormality or disorder that makes it difficult, if not impossible, for him to control his dangerous behavior.  Br. in Supp., dkt. 7, at 17.  As the State points out, *Hendricks* does not necessarily help Stowe: in that case, the Court expressly rejected the notion that "mental illness" was required for

---

[4] As noted previously, Stowe's claim that he is not getting any therapeutic value out of his confinement, while concerning, is defaulted and not before the court in this proceeding.

civil commitment, upholding a civil commitment scheme that defined the class of persons eligible for confinement to those suffering from a "mental abnormality" or a "personality disorder."  521 U.S. at 358-59.  As noted previously, there is no dispute that Stowe has been diagnosed with a personality disorder.

The gist of Stowe's claim seems to be that the State did not prove that his personality disorder makes it seriously difficult to control his dangerous behavior, as required by *Hendricks* and its successor, *Kansas v. Crane,* 534 U.S. 407, 413 (2002).  *See* Reply, dkt. 11, at 9.  But Stowe failed to develop any legal argument, either here or in the state courts, as to why the *Hendricks/Crane* standard for civil commitments necessarily applies to a determinate NGI confinement scheme like Wisconsin's.  His brief in this court includes only a perfunctory citation to *Richard S. v. Carpinello*, 589 F.3d 75, 83 (2d Cir. 2009), which did hold that *Hendricks/Crane* established a substantive due process standard that applied to insanity commitments.

However, Stowe offers no explication of the facts or legal analysis employed in that case and makes no attempt to persuade this court to adopt its reasoning; he simply cites it and moves on.  *See* dkt. 7, at 17.  This court will not make his arguments for him, particularly when it is unclear whether the state courts have been fairly apprised of the claim.  *Nelson v. Napolitano,* 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); *United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those

arguments raise constitutional issues.") (quotation omitted)).  And in any case, circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court," so *Richard S.* does not help Stowe anyway.  *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam).  Finally, Stowe's citation to two snippets from his conditional release hearing is insufficient to permit this court to conclude the State failed to meet the *Hendricks/Crane* standard, even if Stowe could somehow convince the court that it must apply.

In sum, Stowe has failed to meet his heavy burden of showing that the Wisconsin courts' adjudication of his claim was contrary to or an unreasonable application of clearly established Supreme Court law.  Accordingly, I recommend that the court deny the petition for a writ of habeas corpus.

ORDER

Pursuant to 28 U.S.C. § 636(b)(1)(B), IT IS RECOMMENDED that Graham Stowe's petition for a writ of habeas corpus be DENIED.

Entered this 26th day of September, 2022.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin  53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

Colleen Marion
Wisconsin State Public Defender
P.O Box 7862
Madison, WI  53707-7862

Lisa Kumfer
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707-7857

Re:   Stowe v. Van Rybroek
      Case No. 18-cv-400-wmc

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before October 11, 2022, by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by October 11, 2022, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,
/s/
Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the  full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the

party objects and must set forth  with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct  a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**